**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RAFAELLA INNELLA<br><br>    v.<br><br>LENAPE VALLEY FOUNDATION, et al. | CIVIL ACTION<br><br>NO.  14-2862 |

## MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Raffaella Innella ("Plaintiff" or "Ms. Innella") alleges that his rights under the

Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, have been violated.

Specifically, Ms. Innella avers that her former employer, Lenape Valley Foundation ("LVF" or

"Defendant") both (1) interfered with her FMLA rights and (2) retaliated against her for

exercising her FMLA rights, because LVF discharged Ms. Innella soon after she requested and

was approved for FMLA leave to care for her ailing daughter.  LVF counters that it legitimately

terminated Ms. Innella because she falsified information on patient records.

LVF moved for summary judgment pursuant to Fed. R. Civ. P. 56.[1]  For the reasons

discussed below the Court grants LVF's Motion in part and denies LVF's Motion in part.

## I.    FACTUAL BACKGROUND

The following facts are undisputed[2] or reflect Ms. Innella's version of the facts in the

record, pursuant to this Court's duty to view all facts and inferences in the light most favorable to

the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

---

[1] LVF filed its Motion for Summary Judgment on April 15, 2015 (Dkt. 55) ("Def.'s Br.").  Ms. Innella responded in opposition to the Motion for Summary Judgment on May 20, 2015 (Dkt. 59) ("Pl.'s Br.").  LVF then filed a reply brief on May 26, 2015 (Dkt. 60) ("Def.'s Reply").  The Court held oral argument on September 30, 2015 and provided for the Plaintiff's submission of an Amended Response to LVF's Statement of Undisputed Facts (Dkt. 65), which was again amended and re-filed on November 4, 2015 (Dkt. 69).  LVF submitted a Reply to Ms. Innella's Amended Response on November 17, 2015 (Dkt. 70) ("Def.'s Suppl.").

[2] Defendant submitted a statement of undisputed facts ("Def.'s SUF") (Dkt. 55-3), to which Ms. Innella responded ("Pl.'s Response") (Dkt. 69).  Plaintiff's response included a counterstatement of undisputed facts ("Pl.'s Counter-

A.      **Ms. Innella's Employment History with LVF**

LVF hired Ms. Innella on March 6, 2008 for the position of Crisis Intervention Worker

("Crisis Worker").  (Def.'s SUF ¶ 2; Def.'s Ex. D).  Throughout her employment by LVF as a

Crisis Worker, Ms. Innella worked at the Doylestown Hospital.  (Def.'s SUF ¶ 3; Def.'s Ex. C

(Innella Dep.) 132:5-8).  While employed by LVF, Ms. Innella reported to Rick Eusebi ("Mr.

Eusebi") only.[3]  (Def.'s SUF ¶ 4; Def.'s Ex. C (Innella Dep.) 131:10-16).  Mr. Eusebi, in turn,

reported to Sharon Curran ("Ms. Curran"), an Associate Executive Director for Clinical Services

at LVF.  (Def.'s SUF ¶ 5; Pl.'s Ex. C (Curran Dep.) 9:1-3).  In her position as Crisis Worker, Ms.

Innella was responsible for, among other things:

> Coverage of and response to all phone and face-to-face contact for
> Lenape Valley Foundation's Crisis and Emergency Services
> Department.  Assessment of clients' treatment needs, including
> direct clinical intervention when appropriate, and arranging of
> appropriate referrals.  Arranging for psychiatric hospitalization
> when appropriate.  Services performed at both Lenape Valley
> Foundation and Doylestown Hospital.  Reports directly to Lenape
> Valley Foundation's Director of Crisis and Emergency Services.

(Def.'s SUF ¶ 7; Def.'s Ex. D).

Ms. Innella's job description also provided that one of her "[e]ssential [r]esponsibilities"

was to "[p]rocure[] and provide[] referral information for outpatient treatment, shelter, funding

or other special needs."  (Def.'s SUF ¶ 1-; Def.'s Ex. D).  Ms. Innella acknowledged additional

roles and responsibilities *not* stated in her Job Description (Def.'s Ex. D)  These responsibilities

included: (1) obtaining county funding for a patient if that patient did not have insurance (Def.'s

---

SUF"), to which Defendant responded ("Def.'s Counter-SUF") (Dkt. 70).  Statements which an opposing party
"disputed" were deemed undisputed for purposes of this Motion if the party's explanation of the dispute was non-
responsive or failed to reference supporting evidence in the record.  FED. R. CIV. P. 56(c), (e).

[3] Ms. Innella states that Ms. Curran was her immediate supervisor (Pl.'s Counter-SUF ¶ 135); however, this
assertion is unsupported in the record.  Indeed, Ms. Innella herself admitted that, throughout her employment at
LVF, Mr. Eusebi was her only immediate supervisor, and that she understood Ms. Curran to be Mr. Eusebi's
supervisor.  (Def.'s Ex. C (Innella Dep.) 131:10-24).

SUF ¶ 10; Def.'s Ex. C (Innella Dep.) 129:7-8); (2) serving as an advocate on behalf of patients, setting forth a case where they should receive funding (Def.'s SUF ¶ 11; Def.'s Ex C (Innella Dep.) 136:5-10); and (3) maintaining patients' privacy in accordance with HIPAA (Def.'s SUF ¶ 15; Def.'s Ex. C (Innella Dep.) 66:5-17, 67:8-11).

## B.      Relevant LVF Policies

LVF maintains a policy regarding abuse of clients or staff, which provides that "[n]o type of abuse or neglect of either clients or employees will be tolerated."  (Pl.'s Ex. K ("Abuse Policy") at LVF-Innella 0783-84).  The Abuse Policy states: "All current employees should receive a copy of this policy.  All new employees should be given a copy of this policy at the time they are hired." (Abuse Policy at LVF-Innella 0784).[4]  LVF ordinarily utilizes a "policy of progressive discipline."  (Def.'s Ex. MM ("Disciplinary Policy") at LVF-Innella 0785).  As described in LVF's Performance Improvement/Disciplinary Action Form, this includes (1) counselling; (2) first written reprimand; (3) second written reprimand; and (4) performance probation, which must be approved by the HR Director.  (Pl.'s Counter-SUF ¶ 152; Pl.'s Ex. B at LVF-Innella 0048).  Offenses listed on the Performance Improvement/Disciplinary Action Form include attendance/tardiness, HIPAA policy violation, standards of performance, violation of policy, consumer care oriented violations, civil rights compliance and "miscellaneous."  (Pl.'s Ex. B).  However, the Disciplinary Policy also provides that LVF "retain[s] the right to administer more immediate discipline in situations so warranting."  (Def.'s Counter-SUF ¶ 152).

---

[4] Ms. Innella denies ever receiving this policy, but provides no evidentiary support for this conclusory assertion. (Pl.'s Counter-SUF ¶ 161; Def.'s Counter-SUF ¶¶ 158, 161).  LVF did, however, provide evidence that it was the LVF's policy and practice at the time Ms. Innella was hired to provide new hires with the Abuse Policy.  (Def.'s Counter-SUF ¶ 158; see also Pl.'s Ex. D (Gorman Dep.) 120:6-122:2).  The Abuse Policy was enforced even if Ms. Innella was personally unaware of it.

**C.      Ms. Innella's FMLA History with LVF**

Ms. Innella applied and was approved for FMLA leave on two prior occasions, first in 2010 and again in 2011.  (Def.'s SUF ¶¶ 16, 20; Def.'s Exs. E, F).  After Ms. Innella's 2010 and 2011 FMLA leaves, she received favorable performance evaluations and merit increases in her salary.  (Def.'s SUF ¶¶ 17-18, 21-22; Def.'s Ex. C (Innella Dep.) 172:21-173:1, 175:24-176:5, 177:15-22, 179:20-23).  Ms. Innella acknowledged that she was not retaliated against for taking FMLA leave in either 2010 or 2011.  (Def.'s SUF ¶¶ 19, 23; Def.'s Ex. C (Innella Dep.) 137:17-19, 140:10-13).

Early in May of 2013, Ms. Innella requested intermittent FMLA leave to care for her minor daughter.  (Def.'s SUF ¶ 28; Def.'s Ex. C (Innella Dep.) 198:6-8).  On May 8th, 2013, Ms. Innella was e-mailed the appropriate forms for requesting FMLA leave.  (Def.'s SUF ¶ 31; Def.'s Ex. I).  Mr. Eusebi and Traci Gorman ("Ms. Gorman"), Human Resources Director at LVF, were carbon copied on this e-mail.  (Def.'s Ex. I).  On May 10th, 2013, Ms. Innella submitted the paperwork for her intermittment FMLA leave application.  (Pl.'s Counter-SUF ¶ 141; Pl.'s Ex. F).  On or about May 16th, 2013,[5] Ms. Innella was approved for intermittent FMLA leave. (Def.'s SUF ¶ 32; Def.'s Exs. J, H).

**D.      Events Leading to Ms. Innella's Termination from LVF**

*1.      Ms. Innella's Previous Written Reprimands and Final Performance Evaluation*

Ms. Innella had previously received two written reprimands during her tenure at LVF. (Def.'s Counter-SUF ¶ 145).  On December 28, 2009, LVF issued a written reprimand to Ms.

---

[5] Plaintiff denies that she received approval for her intermittent FMLA leave on May 16, 2013, and avers that she received approval on May 17, 2013.  (Pl.'s Response ¶ 32; Pl.'s Ex. F).  However, this dispute is not material as the key date for purposes of establishing temporal proximity is the date that Ms. Innella *invoked* her FMLA rights, which is, latest, May 8, 2013, the date that Ms. Innella received the paperwork to apply for her intermittent FMLA leave.  See Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 256 (3d Cir. 2014) (finding that the plaintiff invoked her rights under the FMLA on date that she notified her employer that she was seeking such leave and received the requisite paperwork, not the date on which the plaintiff was approved for such leave).

Innella after there were complaints made about her by her co-workers (the "2009 Reprimand").

(Def.'s Counter-SUF ¶ 145; Def.'s Ex. KK).  In the 2009 Reprimand, the problem was identified

as "abuse of staff," and an attached letter indicates that Ms. Innella was accused of being

verbally abusive to two co-workers.  (Def.'s Ex. KK).

In a subsequent written reprimand dated June 11, 2010, LVF issued a Performance

Improvement/Disciplinary Action Form for Ms. Innella (the "2010 Reprimand").  (Def.'s

Counter-SUF ¶ 145; Def.'s Ex. LL).  In the 2010 Reprimand, LVF identified the problems as

dress code violations and quality of care concerns.  (Def.'s Ex. LL).  The written reprimand

elaborates on the quality of care concerns thusly:

> We recently received a written complaint from the Emergency
> Department in which it is reported that you said someone was not
> really a crisis patient.  This should never be said of someone we
> have been assisting with in [sic] the [Emergency Department].
> There does not seem to have been a reason not to have allowed the
> patient to be sent to our area at the point in time that this was
> requested.  You created an impression that we were not being
> helpful, and this resulted in the complaint.
>
> Additionally, there was recently a 6 year old brought by her mother
> at shift change.  The day staff report having told you that she had
> not yet been evaluated.  You sent these people home without
> providing any services.  This is completely unacceptable, as is your
> documentation of this contact which creates an impression that the
> day staff were [sic] negligent.  Once again, this is not acceptable
> professional behavior for someone working in our department.

(Def.'s Ex. LL).

Ms. Innella received her final performance evaluation on February 19, 2013 (the "2013

Performance Evaluation").  (Pl.'s Counter-SUF ¶ 136; Pl.'s Ex. E).  In Part A of the 2013

Performance Evaluation, Ms. Innella was rated as "Acceptable" for each of the eight (8)

categories, which include: (1) prompt in arriving at work; (2) regularity of attendance;

(3) personal appearance and demeanor; (4) adherence to work schedule; (5) adherence to LVF

policies and regulations; (6) adherence to safety procedures; (7) gets along well with other staff; and (8) supporting recovery, resiliency and/or everyday lives.  (Pl.'s Ex. E).  In Part B of the 2013 Performance Evaluation, Ms. Innella earned a performance rating of "meets expectations" in each of the six (6) categories.  (Id.).  "Meets expectations" is in the middle of the performance rating grades, which range, in descending order: (1) exceptional; (2) exceeds expectations; (3) meets expectations; (4) needs improvement; and (5) unsatisfactory.  (Id.).  The Part B categories included: (1) quality of work; (2) quantity of work; (3) supervisory relationships; (4) initiative; (5) work habits; and (6) fiscal responsibility.  (Id.).

2.      *Client RB*

On May 8th, 2013, Ms. Innella met with a male client identified as RB ("RB").  (Pl.'s Ex. H).  That evening, Eusebi received an e-mail from Barbara Taubenberger, Director of Emergency Services at Doylestown Hospital, with the subject heading "Complaint," about Ms. Innella's treatment of a patient.  (Def.'s SUF ¶ 35; Def.'s Ex. K).  On May 10th, 2013, Eusebi met with Ms. Innella to discuss issues that had arisen with respect to her handling of RB, and to inform her that a complaint had been made about her regarding her treatment of RB.  (Def.'s SUF ¶ 37; Def.'s Ex. C (Innella Dep.) 231:11-21).  Mr. Eusebi prepared a Supervision Note for that meeting, signed by Ms. Innella, in which he wrote that Ms. Innella "must avoid any repetition of doing anything to cause someone seeking services to feel services are being denied or that they are being treated in an uncaring manner."  (Def.'s SUF ¶¶ 39-41; Def.'s Ex. M). That same day, Ms. Innella met with Curran.  (Def.'s SUF ¶ 42).  Ms. Curran prepared a memo regarding the meeting, dated May 10, 2013, (the "Supervision Memo"), in which Ms. Curran stated that Ms. Innella "brought up the recent complaint from the client RB."  (Def.'s Ex. N). The Supervision Memo indicated that Curran "explained the investigation into this complaint

[was] ongoing and that we [would] need to meet with [Ms. Innella] when it [was] complete," and that it was "serious to have ED staff and a client complaining about [Ms. Innella's] performance." (Id.).

3.     Clients GM and DL

On May 14, 2013, Ms. Innella met with a client identified as GM ("GM"). (Def.'s SUF ¶ 45; Def.'s Ex. O). Ms. Innella prepared a voluntary funding emergency face sheet (the "Voluntary Funding Request") for GM. (Def.'s SUF ¶ 47; Def.'s Ex. P). Although GM informed Ms. Innella that she was suffering from depression and anxiety, Ms. Innella did not include that statement in the Voluntary Funding Request.[6] (Def.'s SUF ¶¶ 51-52; Def.'s Ex. C (Innella Dep.) 253:11-18; Def.'s Ex. P). The Bucks County Mental Health Delegate denied Ms. Innella's funding application for GM. (Def.'s SUF ¶ 54; Def.'s Ex. C (Innella Dep.) 249:20-21). The next day, May 15, 2013, GM returned to the Crisis Center at Doylestown Hospital. (Def.'s SUF ¶ 57; Def.'s Ex. O). Upon her arrival at the Crisis Center, GM told another crisis worker that she had met with another crisis worker the previous night and that the crisis worker was "rude and mean and did not take [GM's] suicidal thoughts seriously." (Def.'s SUF ¶ 58; Def.'s Ex. O). On May 15, 2013, a different crisis worker handling GM was able to obtain funding from another mental health delegate. (Def.'s SUF ¶ 59; Def.'s Ex. O).

Also on May 14, 2013, Ms. Innella met with a client identified as DL ("DL"). (Def.'s SUF ¶ 60; Def.'s Ex. C (Innella Dep.) 263:13-15). The Adult Crisis Assessment Form prepared for DL indicates that DL told Ms. Innella that he was schizophrenic and bipolar. (Def.'s SUF

---

[6] Plaintiff does not dispute this fact. However, Ms .Innella did state in her deposition that this information was included on GM's Adult Crisis Assessment, which she also stated was in the possession of the delegate who was deciding GM's funding request. (Def.'s Ex. C (Innella Dep.) 253:18-21). That GM had suicidal ideations, homicidal ideations, and depression is included on GM's Adult Crisis Assessment form. (Def.'s Ex. O). Likewise, Ms. Innella included information on client DL's Adult Crisis Assessment Form which is *not* included on DL's Voluntary Funding Request. (Compare Def.'s Ex. Q, with Def.'s Ex. R). Ms. Innella also testified that, as with GM, the mental health delegate deciding DL's funding request saw both the Adult Crisis Assessment Form and the Voluntary Funding Request prepared for DL. (Def.'s Ex. C (Innella Dep.) 286:16-17).

¶ 63; Def.'s Ex. Q).  Ms. Innella prepared a Voluntary Funding Request for DL, which does not indicate that DL is schizophrenic or bipolar.  (Def.'s SUF ¶¶ 65, 68; Def.'s Ex. R).  The Bucks County Mental Health Delegate denied Ms. Innella's funding application for DL.  (Def.'s SUF ¶ 69; Def.'s Ex. Q; Def.'s Ex. C (Innella Dep.) 286:13-17).  DL returned to the Crisis Center the next day on May 15, 2013, at which time another crisis worker was able to obtain funding for DL to return to an inpatient program.  (Def.'s SUF ¶¶ 71-72; Def.'s Ex. Q; Def.'s Ex. C (Innella Dep.) 286:23-287:4).

4.      *The Investigation and Termination of Ms. Innella*

On May 16, 2013, Mr. Eusebi e-mailed Ms. Curran regarding the issues that had arisen with respect to Ms. Innella's treatment of GM and DL, stating that he was "concerned that [Ms. Innella] has not only lost the confidence of the ER staff, but now also that of her coworkers and that of the [County] Office.  It may not be feasible for her to continue to work."  (Def.'s SUF ¶¶ 75-76; Def.'s Ex. T).  In the morning of May 17, 2013, Ms. Innella met with Ms. Curran and Mr. Eusebi to discuss the complaints that were being made about Ms. Innella and her care of clients RB, GM, and DL.  (Def.'s SUF ¶ 77; Def.'s Ex. C (Innella Dep.) 194:12-16, 295:13-20).  During that meeting, Ms. Curran became aware of Ms. Innella's request for intermittent FMLA leave to care for her ailing daughter.  (Pl.'s Ex. C (Curran Dep.) 140:8-18).  After this meeting, Ms. Curran investigated the complaints made against Ms. Innella.  (Def.'s SUF ¶ 79-91; Def.'s Ex. U; see also Pl.'s Ex. C (Curran Dep.) 125:21-126:5).  After Ms. Curran completed her investigation on May 17, 2013, she again met with Ms. Innella in the company of Mr. Eusebi and Ms. Gorman, during which meeting LVF terminated Ms. Innella.  (Def.'s SUF ¶¶ 93-94; Def.'s Ex. C (Innella Dep.) 298:5-21).  Neither party has presented any evidence indicating that Ms.

Innella's request for intermittent FMLA leave, or approval therefor, was discussed at this later meeting.

On the date of Ms. Innella's termination, May 17, 2013, a Performance Improvement/Disciplinary Action Form (the "Initial Termination") was completed in which the causes for her termination were detailed, including that: (1) a male patient (DL) was perceived to be on the phone with Ms. Innella for a long time before receiving treatment on May 14, 2013; (2) though Ms. Innella indicated that this client (DL) appeared intoxicated, the subsequent laboratory results showed no evidence of intoxication; (3) when Ms. Innella called to advocate for funding from the county delegate, the delegate reported that Ms. Innella's tone indicated she was not advocating for approval, with Ms. Innella stating "get a load of this . . . ."  (Def.'s SUF ¶¶ 95-98; Def.'s Ex. V) (alteration in original).

### 5.    *The Appeal Process*

On May 17, 2013, the date of her termination, Ms. Innella e-mailed Gorman and stated that she was "respectfully taking step two in the complaint . . . appeals process in an attempt to shed light on what took place."  (Def.'s SUF ¶ 99; Def.'s Ex. W).  The second step in the appeals process is to meet with the LVF Executive Committee.  (Def.'s SUF ¶ 104; Def.'s Ex. C (Innella Dep.) 317:3-6).  The third and final step in the appeal process is to appeal the decision of the Executive Committee to the CEO of LVF, Alan Hartl.  (Def.'s SUF ¶ 119; Def.'s Ex. C (Innella Dep.) 317:8-10).  The Executive Committee that participated in the appeal of Plaintiff's termination consisted of: JoAnne Davis (Associate Executive Director for Mobile Services for LVF); Walter Wolaniuk (Chief Financial Officer for LVF); Mary Jane Fletcher (Associate Executive Director for Developmental Programs for LVF); Mary Dubyk (Associate Executive Director for Systems Initiatives for LVF); Dr. Karen Hammers (Medical Director at LVF); and

9

Dr. Phillip R. Braun (Associate Executive Director for Rehabilitative Services for LVF).  (Def.'s Ex. X (Gorman Dep.) 243:22-244:23; see also Def.'s Ex. JJ).

Curran, although part of the Executive Committee, did not participate in the review of Ms. Innella's termination because Curran was one of the initial decisionmakers.  (Def.'s SUF ¶ 114; Def.'s Ex. S (Curran Dep.) 172:11-173:11).

LVF acknowledges that one of the allegations made on the Initial Termination Form was incorrect, specifically that Ms. Innella never came out to see the client in question.  (Def.'s SUF ¶¶ 115-16; Def.'s Ex. BB).  Dr. Braun, one of the members of the Executive Committee who participated in the appeal of the decision to terminate Ms. Innella, stated:

> After a full review of the documents submitted and after having had an opportunity to be present at the appeal meeting on 5/23/13, I believe the termination should stand.  It may be true that one detail of the termination document was incorrect (the statement that she never came out to see client), the rest of the documentation forces me to conclude that this employee was not consistently operating in the best interest of our crisis clientele.

(Def.'s Ex. BB).[7]

Based upon the recommendation of the Executive Committee, Gorman prepared a revised Performance Improvement/Disciplinary Action Form (the "Revised Termination Form"), which included information uncovered during the course of a post-termination investigation and removed the incorrect information about Ms. Innella's not coming out to see the client.  (Def.'s SUF ¶ 117; Def.'s Ex. CC).  The Revised Termination Form, dated May 28, 2013, contained additional information about Ms. Innella's treatment of not only DL but RB and GM.  (Def.'s

---

[7] At her deposition, Curran (Pl.'s Ex. C (Curran Dep.) 48:12-22) also acknowledged that Doylestown Hospital Emergency Room nurse Jeremy Motley gave incorrect information – that Plaintiff never came out to see one of the patients – but also that the video subsequently obtained during the investigation of Plaintiff confirmed other accounts of Plaintiff's interaction with that client, namely Plaintiff's "behavior towards this client and how long it took her to get her to the lobby to see him."  (Pl.'s Ex. C (Curran Dep.) 48:14-17).

SUF ¶ 119; Def.'s Ex. DD).[8]  Each member of the Executive Committee who was involved in

the appeal of Ms. Innella's termination sent their approval of the Revised Termination Form,

thereby upholding Ms. Innella's termination.  (Def.'s Ex. EE).

Ms. Innella requested, and was granted, a hearing with LVF CEO Alan Hartl ("Mr.

Hartl"), which occurred on June 6, 2013.  (Def.'s SUF ¶¶ 121-23; Def.'s Exs. GG, HH).  At the

hearing with Mr. Hartl, Ms. Innella was given the opportunity to address concerns she had with

the Revised Termination Form.  (Def.'s SUF ¶ 124; Def.'s Ex. C (Innella Dep.) 333:6-17).  In a

letter dated June 11, 2013, Mr. Hartl informed Ms. Innella that he was affirming the decision to

terminate her employment at LVF, consistent with the reasons set forth in the Revised

Termination Form.  (Def.'s SUF ¶ 125; Def.'s Ex. II).

## F.     Comparator Evidence

Ms. Innella points to one LVF employee who she claims is similarly situated to her but

received more favorable treatment.  This employee, Barbara Brentlinger ("Ms. Brentlinger"),

was discovered to have falsified her job application but was not terminated by LVF when this

falsification was discovered.  (Pl.'s Counter-SUF ¶ 230; Pl.'s Ex. C (Curran Dep.) 182:18-

184:7).  At the Ms. Brentlinger's falsification was discovered, LVF had different policies in

place.  (Def.'s Counter-SUF ¶ 222; Pl.'s Ex. C (Curran Dep.) 184:16-18).  When Ms. Curran

confronted Ms. Brentlinger about her falsified job application, Ms. Brentlinger admitted that she

lied about having completed her master's degree.  (Def.'s Counter-SUF ¶ 222; Pl.'s Ex. C

(Curran Dep.) 184:2-7).  Even though Ms. Brentlinger did not complete her master's degree as

stated on her job application, LVF determined that Ms. Brentlinger was still overqualified for her

position, a factor that militated against her immediate termination.  (Def.'s Counter-SUF ¶ 222;

---

[8] Ms. Innella argues that the Revised Termination Form contains false allegations, but as with many of her
contentions, Ms. Innella fails to proffer any evidence in support of this conclusory assertion.

Pl.'s Ex. C (Curran Dep.) 185:5-11).  Under LVF's current policies and procedures, discovery of Ms. Brentlinger's falsification would have resulted in her immediate termination.  (Def.'s Counter-SUF ¶ 222; see also Pl.'s Ex. C (Curran Dep.) 185:12-15 ("Today, if someone falsified a job application or credentials, [LVF] would terminate their employment immediately.").

## II.   JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1331 because Innella brings her claim under the FMLA, codified at 29 U.S.C. § 2601 *et seq*.  Venue is proper under 28 U.S.C. §§ 1391(b)(1)-(2).

## III.   STANDARD OF REVIEW

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule [ ] set out specific facts showing a genuine issue

for trial." FED. R. CIV. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

In employment discrimination cases, the summary judgment standard "is applied with added rigor . . . [because] intent and credibility are crucial issues." Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431 (3d Cir.1997) (internal quotation marks omitted). The Third Circuit has stated that "summary judgment is . . . rarely appropriate in this type of case." Marzano v. Computer Sci. Corp. Inc., 91 F.3d 497, 509 (3d Cir.1996). "Simply by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment."  Id. at 509–10 (internal quotation marks omitted).

## IV.   DISCUSSION

The FMLA was enacted "to 'balance the demands of the workplace with the needs of families,' and 'to entitle employees to take reasonable leave for medical reasons . . . in a manner that accommodates the legitimate interests of employers.'" Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140–41 (3d Cir.2004) (quoting 29 U.S.C. § 2601(b)(1), (b)(3)).  An "eligible employee" under the FMLA, therefore, is entitled to "a total of twelve workweeks of leave during any twelve month period" if he or she has a "serious health condition that makes [him or her] unable to perform the functions of [his or her] position." Id. (quoting 29 U.S.C. § 2612(a)(1)(D)).  The Third Circuit has made clear that "firing an employee for a valid request for

FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir.2009).

The FMLA provides, in pertinent part:

> (1) Exercise of rights
>
> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
>
> (2) Discrimination
>
> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a)(1), (2).

These provisions form the basis for what are known respectively as FMLA "interference" and "retaliation" claims. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012).

That "interference" and "retaliation" are discrete claims finds support in the English language. Webster's definition of "interference" includes that it is "the act or process of interfering . . . something that interferes : OBSTRUCTION."[9] The definition for "retaliate," in contrast, provides: "to repay (as an injury) in kind . . . to return like for like . . . to get revenge."[10]

Plaintiff has asserted claims under both theories. LVF seeks summary judgment on both Ms. Innella's retaliation and interference claims. The Court will address each in turn.

---

[9] *Interference*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988).

[10] *Retaliate*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988).

**A.      Parties' Contentions**

**1.      Retaliation**

**i.      Prima Facie Case**

As the moving party, LVF provides two reasons why Ms. Innella failed to prove causation.  First, Ms. Innella cannot prove causation because the Executive Committee, which reviewed Ms. Innella's termination, did so without any knowledge of her application for FMLA leave.  (Def.'s Br. at 6) (citing Lichtenstein, 691 F.3d at 308; Phillips v. Donahoe, 2013 U.S. Dist. LEXIS 160537, at *62 (M.D. Pa. Nov. 7, 2010); Bedford v. SEPTA, 867 F. Supp. 288, 293 (E.D. Pa. 1994)).  Second, because Ms. Innella testified that she was terminated for reasons other than her request for FMLA leave, Ms. Innella cannot satisfy the "but-for" standard of causation applicable to FMLA retaliation claims.  (Def.'s Br. at 6) (citing Latta v. U.S. Steel, 2013 U.S. Dist. LEXIS 170569, *14 (W.D. Pa. Dec. 4, 2013)).

Ms. Innella responds that the temporal proximity between her invocation of FMLA rights and termination not only establishes the causal connection but the inference of retaliatory motive. (Pl.'s Br. 43).  Ms. Innella also argues that her termination and LVF's subsequent investigation into her treatment of clients RB, GM and DL constitute a "pattern of antagonism" that independently establishes the causal connection.  (Pl.'s Br. 43-44).

**ii.      Pretext**

LVF argues that even if Ms. Innella were able to establish a prima facie case for FMLA retaliation, she cannot refute LVF's evidence that it terminated Ms. Innella for the legitimate, non-discriminatory reason that she committed neglect and falsified a client record.  (Def.'s Br. at 7).

Ms. Innella argues that the reasons articulated by LVF on its Revised Termination Form and elsewhere are pretextual because: (1) the span of time between Ms. Innella's invocation of rights under the Act and her termination is unduly suggestive; (2) the investigation of Ms. Innella constituted a "pattern of antagonism"; (3) there were inconsistencies in the bases for Ms. Innella's termination; and (4) the differences between the Revised Termination Form and the Initial Termination Form betray weaknesses, implausibilities and contradictions in LVF's articulated reason for termination Ms. Innella.  (Pl.'s Br. 42-45).  Ms. Innella also argues that LVF's discriminatory animus is evident from their preferential treatment of a comparator not in Ms. Innella's protected class, Ms. Brentlinger.  (Def.'s Ex. OO ("Oral Arg. Tr.") 28:14-29:3).

In reply, LVF argues that the other employee Ms. Innella points to is not "similarly situated" to Ms. Innella because there were different policies in place at the time Brentlinger's falsification was discovered.  (Def.'s Suppl. 8).

## 2.     Interference

LVF contends that Ms. Innella's interference claim fails because her FMLA benefits were never actually withheld.  (Def.'s Suppl. 4; Oral Arg. Tr. 21:8-11).  LVF also argues that, because Ms. Innella was terminated for a reason wholly unrelated to her invocation of rights under the FMLA, her interference claim cannot proceed.  (Def.'s Suppl. 5).

Ms. Innella disagrees, contending that after she was approved for FMLA leave, LVF interfered with her exercise of those rights by terminating her on the very day that she was going to take her leave.  (Pl.'s Br. 38).  Ms. Innella further contends that LVF has failed to show that she was terminated for reasons other than for interference with her rights under the FMLA.

**B.      Retaliation**

**1.      Legal Standard**

"To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." Lichtenstein, 691 F.3d at 301-02.  Under the interpretation propounded by the Department of Labor, "employers are barred from considering an employee's FMLA leave 'as a negative factor in employment actions such as hiring, promotions or disciplinary actions.'" Id. at 301 (quoting C.F.R. § 825.220(c)).  "Accordingly, an employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted." Id.

"Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law." Id. at 302.  There are two different frameworks by which courts assess FMLA retaliation claims. Claims based on circumstantial evidence proceed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), while claims based on direct evidence proceed under the mixed-motive framework established in Price Waterhouse v. Hopkins, 490 U.S. 228, 276-77 (1989) (O'Connor, J., concurring). Id.  Here, Plaintiff proceeds on an FMLA retaliation claim based on circumstantial evidence.  Accordingly, the Court assesses Plaintiff's claim for FMLA retaliation under the burden-shifting *McDonnell-Douglas* framework.

Under this framework, Ms. Innella "has the initial burden of establishing a prima facie case.  To do so, she must point to evidence in the record sufficient to create a genuine factual dispute about each of the three elements of her retaliation claim." Id.  If Plaintiff can do this, the

burden shifts to LVF to "articulate some legitimate, nondiscriminatory reason' for its decision."
Id. (quoting McDonnell Douglas Corp., 411 U.S. at 802).  If LVF is able to meet this minimal
burden, Ms. Innella must then "point to some evidence, direct or circumstantial . . . from which a
factfinder could reasonably . . . disbelieve [LVF's] articulated legitimate reasons."  Id. (quoting
Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

**2.      Prima Facie Case**

LVF does not dispute that Ms. Innella both invoked her right to FMLA leave and
ultimately suffered an adverse employment action.  (Def.'s Br. 5).  Thus the Court will only
address causation, i.e., that Ms. Innella's invocation of rights under the FMLA was a "negative
factor" in her discharge.  See 29 C.F.R. § 825.220(c).

To demonstrate a prima facie case of causation, Ms. Innella must point to evidence
sufficient to create an inference that a causative link exists between her FMLA leave and her
termination.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-81 (3d Cir. 2000).  There
is no set way to establish a causal connection.  Kachmar v. SunGard Data Sys., Inc., 109 F.3d
173, 177 (3d Cir. 1997).  Rather, "[t]he element of causation, which necessarily involves an
inquiry into the motives of an employer, is highly context-specific."  Id. at 178.  The requisite
causal connection can be established by (1) temporal proximity between the protected activity
and the adverse employment action, (2) circumstantial evidence of a "pattern of antagonism"
following the protected conduct, or (3) where the proffered evidence, looked at as a whole,
suffices to raise the inference.  Id. at 177.

However, "except in circumstances where the timing of the alleged retaliatory act is
'unusually suggestive,' timing alone is never sufficient to demonstrate a causal link between the
termination decision and an exercise of FMLA rights."  Helfrich v. Lehigh Valley Hosp., No. 3-

5793, 2005 WL 670299, at *19 (E.D. Pa. Mar. 18, 2005) (citing Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).  While "there is no bright line rule as to what constitutes unduly suggestive temporal proximity," LeBoon, 503 F.3d at 233, courts in this and other Circuits have found temporal proximity ranging from two days, see Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), to three weeks, see Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283 (6th Cir. 2012), sufficient at the prima facie stage for establishing causation.  See also Lichtenstein, 691 F.3d at 307 (finding seven days unduly suggestive).

**i.      Analysis of Ms. Innella's Prima Facie Case**

Taking into account all the facts in the record, viewed in the light most favorable to Ms. Innella, the Court concludes that Ms. Innella has a prima facie case of retaliation under the FMLA.

First, the Court finds that, in this case, the nearly ten-day gap between Ms. Innella's leave request and termination is sufficient to establish a causal connection between the two.  In Budhun v. Reading Hospital & Medical Center, 765 F.3d 245, 256 (3d Cir. 2014), the Third Circuit noted that the date on which the plaintiff "invoked the protections of the Act" was the date on which an HR employee of the defendant employer e-mailed the plaintiff "FMLA leave forms and asked her to complete them."  Id.  Here, Ms. Innella received the FMLA leave forms from LVF's HR department on May 7th, 2013.  (Def.'s Ex. I).

In addition, even though Ms. Innella has failed to proffer evidence that any member of the Executive Committee that decided her appeal had knowledge of her request for intermittent FMLA leave,[11] it is clear from the record that those decisionmakers responsible for her

---

[11] Defendant met its burden under Rule 56 in providing affidavits from each of the members of the Executive Committee deciding Ms. Innella's appeal providing that no such member had knowledge of Ms. Innella's request for intermittent FMLA leave.  (Def.'s Ex. JJ)  Ms. Innella has not countered this showing with any evidence of her own indicating that members of the Executive Committee hearing her appeal did, indeed, have such knowledge.

termination, namely Ms. Curran, Mr. Eusebi and Ms. Gorman, did have such knowledge.  (Def.'s Ex. I; Pl.'s Ex. C (Curran Dep.) 140:12-22).  Furthermore, "an employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted."  Lichtenstein, 691 F.3d at 300.  Ms. Innella has established a prima facie case for retaliation under the FMLA.  Accordingly, the burden shifts to LVF to provide a legitimate, nondiscriminatory reason for why it terminated Ms. Innella.

**3.**      **Pretext**

Even though Ms. Innella has made out a prima facie claim, her retaliation claim still fails because LVF provided a legitimate reason for terminating Ms. Innella, and Ms. Innella has not demonstrated that the proffered reason was pretextual.

Because Ms. Innella has established a prima facie case, the burden of production (but not of persuasion) shifts to LVF to "articulate some legitimate, nondiscriminatory reason for the employee's [termination]."  McDonnell Douglas Corp., 411 U.S. at 802.  This burden of production is a low standard.  See Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir.1999) ("[T]he Defendant need not persuade the court that it was actually motivated by the proffered reasons.") (internal quotation marks omitted).  Here, LVF has met that burden by providing compelling evidence that Ms. Innella was terminated for failure to abide by the Abuse Policy.

To defeat summary judgment, Ms. Innella must point to some direct or circumstantial evidence from which a factfinder could reasonably either (1) disbelieve LVF's articulated reason, or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of LVF's action.  See Fuentes, 32 F.3d at 764.  To do so, Ms. Innella can either (1) discredit LVF's reason, by coming forward with such weaknesses, implausibilities, incoherencies, inconsistencies, or contradictions in the proffered reason to allow

a rational factfinder to find the reason unworthy of credence; or (2) adduce evidence that discrimination was more likely than not a motivating or determinative cause.  Id. at 764-65.  Ms. Innella's evidence must allow a reasonable factfinder to infer that each proffered reason was either a post hoc fabrication or otherwise did not actually motivate the employment decision. See id. at 764.  Specifically, to create an inference that LVF's stated reason for terminating Ms. Innella was pretextual, Ms. Innella can point to (1) LVF's lack of credibility, (2) the timing of Ms. Innella's termination, or (3) LVF's treatment of similarly situated employees not of her protected class.  Walton v. Mental Health Ass'n of S.E. Pa., 168 F.3d 661, 669 (3d Cir. 1999).

i.      **Analysis on Legitimate, Nondiscriminatory Reason and Showing Pretext**

The record establishes that LVF had a legitimate, nondiscriminatory reason for terminating Ms. Innella, namely, that she committed client abuse and neglect in addition to falsifying a client record, as discussed, supra Part IV.B.3.  Furthermore, the evidence supporting LVF's claim that it terminated Ms. Innella for neglect and falsification of client record is substantial and virtually undisputed.[12]

There is undisputed evidence in the record that Ms. Curran conducted her own investigation by viewing the video recording of one of the subject clients in the lobby, talking to some of the Doylestown Hospitals ER staff (including Mr. Motley) (Pl.'s Ex. C (Curran Dep.) 67:10-12), speaking with Ms. Innella as well as the Bucks County delegate that rejected the funding requests, Ms. Carol Bamford ("Ms. Bamford") (Pl.'s Ex. C (Curran Dep.) 62:14-17), and one of the subject clients (Pl.'s Ex. C (Curran Dep.) 146:14-147:20).  The Executive Committee completed its own review -- which included an opportunity for Ms. Innella to be present –

---

[12] As noted, Ms. Innella does provide evidence that Mr. Motley's statement that Ms. Innella did not come to the lobby to meet the client was inaccurate.  However, this was acknowledged by LVF throughout their appeal process, and was indeed accounted for in the Revised Termination Form, which excised any reference that inaccuracy.  (Pl.'s Ex. H).

culminating in the determination that Ms. Innella's termination should stand.  (Def.'s Ex. BB) ("It may be true that one detail of the termination document was incorrect . . . [but] the rest of the documentation forces me to conclude that this employee was not consistently operating in the best interest of our crisis clientele.  There was a pattern evidenced wherein client concerns were minimized, and attempts appear to have been made on more than one occasion, of trying to refer clients away from crisis.").

Ms. Innella attempts to undermine LVF's credibility by pointing to alleged inconsistencies and contradictions in the reasons underlying Ms. Innella's termination, including, among other things: (1) Mr. Motley's statement that Ms. Innella never came to the lobby to greet one of the clients; (2) Ms. Curran's "admission" that a client could be intoxicated on benzodiazepines; and (3) that Ms. Innella did not have a history of complaints.  (Pl.'s Br. 40-41). However, these alleged inconsistencies and contradictions are superficial at best, verging on misrepresentations of the underlying testimony.  First, as the Court has already noted, the Executive Committee acknowledged that Mr. Motley's statement was inaccurate, but that subsequent investigations corroborated the gravamen of LVF's allegations of Ms. Innella's wrongdoing.  (Def.'s Ex. BB).  Second, Ms. Curran clearly stated that being "[p]ositive for a drug does not equal intoxication."  (Pl.'s Ex. C (Curran Dep.) 17:9-10).  Finally, the record makes clear that Ms. Innella had at least two complaints pre-dating her invocation of rights under the FMLA.  (Def.'s Exs. KK, LL).  Additionally, Ms. Innella's contention that LVF "ignored" its progressive disciplinary policy with respect to her termination (Pl.'s Br. 44) is ill-supported in the face of LVF's assertion, supported by documentary evidence and testimony, that it does not have a progressive disciplinary policy when it comes to neglect and abuse.  (Def.'s Counter-SUF ¶ 152; Def.'s Ex. MM; see also Pl.'s Ex. C (Curran Dep.) 145:4-11).

The Court also notes that Ms. Innella never had a problem requesting and receiving FMLA leave from LVF in the past, and indeed, was twice granted FMLA leave.  While this history does not, as a matter of law, bar Ms. Innella from establishing pretext, a reasonable factfinder could determine that it bolsters LVF's assertion that Ms. Innella's termination had nothing to do with her FMLA leave.  Ms. Innella's history of written reprimands also undermines her argument that the temporal proximity between her invocation of FMLA rights and termination is unduly suggestive, and therefore supportive of pretext.  (Pl.'s Br. 42-43).  The record reflects that Ms. Innella received two written reprimands before her request for FMLA leave in May of 2013.  The 2010 Reprimand in particular specifies that Ms. Innella's discipline is for malfeasance with respect to client care and client documentation.  (Def.'s Ex. LL).  These are the very abuses for which Ms. Innella was terminated in 2013.  (Def.'s Exs. V, DD).  The similarity between the 2010 Reprimand and the Initial and Revised Termination Forms militate against finding pretext in this case.  See Shaner v. Synthes, 204 F.3d 494, 504 (3d Cir. 2000).

Furthermore, "[d]isagreement with the defendant's decisions is insufficient, as a matter of law, to survive summary judgment."  Brown v. DB Sales, Inc., No. 4-1512, 2005 WL 3591533, at *11 (E.D. Pa. Dec. 29, 2005).  Indeed, a very recent decision by the Third Circuit in Willis v. UPMC Children's Hospital of Pittsburgh, No. 15-526, ___ F.3d ___ (Dec. 22, 2015), supports this Court's decision on pretext.  In Willis, an age discrimination case, the Third Circuit applies the *McDonnell-Douglas* burden-shifting test and concluded that the plaintiff had established a prima facie case and that the defendant had come forward with sufficient nondiscriminatory reasons, thereby requiring the burden to shift back to the plaintiff to show pretext.  As in this case, the plaintiff in Willis was accused of conduct warranting discipline, which the defendant

asserted as ground for his termination.  And, as in this case, the plaintiff asserted that the grounds

proffered by the defendant were not credible.  The Third Circuit rejected this argument, stating:

> As the District Court correctly noted, at the pretext stage it is not a
> court's role to 'rule on the strength of cause for discharge.  The
> question is not whether the employer made the best, or even a
> sound, business decision: it is whether the real reason is
> discrimination.

Willis v. UPMC Children's Hosp. of Pittsburgh, No. 15-526, slip op. at 16 (Dec. 22, 2015).

The Third Circuit also agreed with the District Court that the plaintiff had not shown that the

reason for discipline was so weak as to render it "unworthy" of credence.  Id. at 18.

Furthermore, the Willis court went on to discuss three different ways the plaintiff can show

pretext and concluded that the plaintiff did not successfully proceed with any of these avenues.

This Court believes that the Willis decision supports the legal conclusions granting summary

judgment in favor of LVF on Ms. Innella's claim of retaliation, because Ms. Innella has not

shown a genuine issue of fact that a reasonable jury could find retaliation.

Finally, the Court agrees with LVF that Ms. Innella's "comparator" evidence is

inadequate.  Although non-precedential, a panel of the Third Circuit "accept[ed] the standard

used by other circuits that to be considered similarly situated, comparator employees must be

similarly situated in all relevant respects."  Wilcher v. Postmaster General, 441 Fed. App'x 879,

882 (3d Cir. 2011).  And, as this Court has noted, "[a]ppropriate comparators might be '[t]wo

employees [who] dealt with the same supervisor, were subject to the same standards, and had

engaged in similar conduct without such differentiating or mitigating circumstances as would

distinguish their conduct or the employer's treatment of them."  Klina v. SEPTA, No. 10-5106,

2011 WL 4572064, at *8 (E.D. Pa. Oct. 3, 2011) (Baylson, J.) (quoting Murphy v. SEPTA, No.

9-1590, 2010 WL 571799, at *8 (E.D. Pa. 2010)).  Ms. Innella's proffered evidence falls far

short of these standards.  Ms. Brentlinger subject to different policies and procedures at the time her falsification was discovered.  Furthermore, Ms. Brentlinger was discovered to have falsified her credentials, however with the result that she was still overqualified for her position.  Ms. Innella, on the other hand, was charged with falsification of a client record, an abuse more directly implicating the safety and well-being of third parties.

## C.        Interference

## 1.        Legal Standard

To make an FMLA interference claim, Ms. Innella must establish that (1) she was an eligible employee under the FMLA; (2) LVF was an employer subject to the FMLA's requirements; (3) she was entitled to FMLA leave; (4) she gave notice to LVF of her intention to take FMLA leave; and (5) she was denied benefits to which she was entitled under the FMLA. See Ross v. Gilhuly, 755 F.3d at 191-92.  Termination can form the basis of an FMLA interference claim.  Erdman v. Nationwide Ins. Co., 582, F3d 500, 508 (3d Cir. 2009) (stating "it would be patently absurd if an employer who wished to punish an employee for taking FMLA leave could avoid liability simply by firing the employee before the leave begins.").

However, "the FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA."  Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 403 (3d Cir. 2007) (citing 29 U.S.C. § 2614(a)(3)(B)).  "[T]he broad sweep of the interference provision is limited by the principle that in order to prevail on an FMLA claim an employee must show prejudice resulting from the employer's violation." Campbell v. Jefferson Univ. Physicians, 22 F. Supp. 3d 478, 486 (E.D. Pa. 2014) (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 88-89 (2002)).  In this Circuit, a plaintiff establishes prejudice by showing that an employer's failure to comply with the statute and

regulations "rendered [her] unable to exercise [an FMLA] right in a meaningful way, thereby causing injury."  Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 143 (3d Cir. 2004).

## 2.    Analysis

By failing to address them, LVF appears to concede that Ms. Innella has established the first four (4) factors of an interference claim: (1) that Ms. Innella was an eligible employee; that LVF is subject to the FMLA; (3) that Ms. Innella was entitled to take FMLA leave; and (4) that Ms. Innella gave notice of her intent to take FMLA leave.[13]  Accordingly, the Court must decide whether LVF interfered with Ms. Innella's FMLA rights by denying her FMLA benefits and/or by terminating her after she was approved for intermittent leave.

As noted above, "interference" is, according to its dictionary definition, a different concept than retaliation.  In addition, the FMLA itself separates claims for retaliation from claims for interference.  See 29 U.S.C. § 2615(a)(1), (2).  Although this Court has decided to grant summary judgment in facor of defendant as to Ms. Innella's claim for retaliation, the Court finds that there are factual issues as to whether LVF "interfered" with Ms. Innella's FMLA rights.  Again, the Court notes that, there is no dispute that Ms. Inella had applied for FMLA rights prior to having any knowledge of disciplinary proceeding, that MS. Innella had completed the appropriate forms, and LVF acknowledged that Ms. Innella was approved for those FMLA rights before she was terminated.  Although LVF asserts that it did give Ms. Innella the benefits to which she was entitled under the Act, Ms. Innella disputes this fact.  In addition to this disputed issue, the issue of what, if any, damages Ms. Innella can prove is not settled as a matter of law.

---

[13] In its Response to Plaintiff's Counterstatement of Undisputed Facts, Defendant contested Plaintiff's proffer that she "intended" to take her leave on May 17, 2013, the day that she was fired.  (Def.'s Counter-SUF ¶ 144). However, the Third Circuit has explained that an employee "takes" rights under the FMLA by their invocation of FMLA rights, not when they actually commence such leave.  Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009).

The Court recognizes that in most FMLA cases the concepts of retaliation and interference are conflated, insofar as they are treated synonymously.  This Court has not found any reported decisions finding only interference.[14]  Nor, however, does the Court see any place for a burden-shifting analysis in a claim for interference.

Under the peculiar circumstances apparent in this case, this Court believes there is good reason to consider the concept of retaliation as different from the concept of interference.  Ms. Innella was approved for her FMLA rights and Ms. Innella was terminated.  Accordingly, Ms. Innella may have some claims for injury and damages as a result of the termination "interfering" with her FMLA rights.  Ms. Innella may argue that LVF should have "stayed" her termination until she had completed her FMLA leave.

---

[14] The Court recognizes that the Third Circuit tangentially addressed the growing preference in courts to dismiss claims of interference where they are "so clearly redundant to the retaliation claim."  Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, n.25 (3d Cir. 2012).  However, the Third Circuit did not address the issue as it was not raised in the lower court nor presented on appeal.  Id.

However, the Seventh Circuit has recognized the meaningful difference between the burdens placed on a plaintiff bringing either an interference claim or an interference claim.  Kauffman v. Fed. Exp. Corp., 426 F.3d 880, 884 (7th Cir. 2005).  The Seventh Circuit explained the difference between retaliation claims and interference claims, explaining:

> [T]he difference is that the first type of claim requires proof of discriminatory or retaliatory intent while the latter requires only proof that the employer denied the employee his or her entitlements under the Act.  Here, Kauffman points to no evidence of discriminatory or retaliatory animus.  Viewing the record in the light most favorable to Kauffman, the nonmoving party, FedEx managers wanted to get rid of him because they thought he was argumentative and a troublemaker, so they pounced on a chance to fire him. But they did so in spite of his rights under the FMLA, not because he asserted those rights.  In other words, they did not seek to punish him for exercising rights or opposing an unlawful procedure; they did not even treat him differently than someone not entitled to FMLA leave.  But whether Kauffman produced evidence of discriminatory or retaliatory animus is "not fatal" to his case.

Id. at 884-85 (citations omitted).

In Kauffman, the plaintiff claim for wrongful discharge under the FMLA pursuant to theories of interference and retaliation.  The district court granted summary judgment.  The Seventh Circuit re-read the plaintiff's claims as one essentially for interference and considered the central issue of the case, namely whether the plaintiff had established his entitlement to FMLA leave.  The Seventh Circuit determined that the plaintiff did indeed provide enough information through his doctor's certification "to satisfy the statute."  Id. at 887.  Accordingly the Seventh Circuit reversed the grant of summary judgment, allowing the claim to proceed under a theory of interference.  Id.

In so holding, the Court at this stage does not have to, and will not, digress and discuss the possible theories of damage that Ms. Innella may have, or any of LVF's defenses thereto.  It is possible that Ms.  Innella will only be entitled to payment of what she would have received under the leave if she had not been terminated.  That, however, cannot now be decided as a matter of law.  Ms. Innella will be required to make a showing of what damages flow from the "interference" assuming a jury were to find in her favor on the allegation of interference.

For these reasons, the Court will deny LVF's Motion for Summary Judgment as to Ms. Innella's claim of interference with her FMLA rights.

## V.    CONCLUSION

An appropriate Order granting in part and denying in part Defendant's Motion follows.

O:\Lana.2015\Innella v. LVF 14-2862\Defs Summ J Memo v2.docx